UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **CHRISTOPHER PETERSON**, individually, and on behalf of those similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>**CREDIT PLUS, INC.**,<br><br>*Defendant*. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br>JURY TRIAL DEMANDED |

Plaintiff Christopher Peterson ("Plaintiff"), on behalf of himself and all others similarly situated, complaining of Defendant Credit Plus, Inc. ("Credit Plus" or "Defendant"), alleges as follows:

## NATURE OF THE CASE

1. This is a consumer class action under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA"), against Credit Plus, a consumer reporting agency.

2. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA in 1970 to ensure the "confidentiality, accuracy, relevancy, and proper utilization" of credit reports. 15 U.S.C. § 1681(b).

3. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including § 1681e(b), which is one of the cornerstone provisions of the FCRA. Whenever a consumer reporting agency prepares a consumer report, § 1681e(b)

requires the consumer reporting agency to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b). This section imposes a high, and often disregarded, standard on consumer reporting agencies. *See, e.g.*, *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived.'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

4.  In the credit reporting industry, Credit Plus is considered a "reseller." A "reseller" is a "consumer reporting agency" that "assembles and merges information contained in the database of another consumer reporting agency or multiple reporting agencies concerning any consumer for purposes of furnishing such information to any third party." 15 U.S.C. § 1681a(u). Importantly, as a consumer reporting agency, Credit Plus is required to follow the maximum possible accuracy requirements of § 1681e(b).

5.  As part of its product offerings, Credit Plus sells data relating to liens and judgments. The data included on that product is obtained, in turn, from a product sold by LexisNexis Risk Solutions, Inc. ("LexisNexis"), called the "RiskView Liens and Judgments Report." The ultimate product sold to the end user bears Credit Plus's logo, states that it is a RiskView Liens and Judgments Report, and indicates that it is "powered by" LexisNexis.

6. Despite selling LexisNexis's data under its own name, Credit Plus does not take any independent steps to verify that the public record information provided by LexisNexis is correct, such as by checking the public records, many of which are available online.

7. LexisNexis, however, is not a reliable source of tax lien and civil judgment information. LexisNexis uses a largely automated and systematic procedure to gather and report derogatory public records in credit reports, such as tax liens and judgments. A long history of litigation shows that LexisNexis does not have adequate procedures to gather updated information about when the tax lien or judgment is released, satisfied, vacated or otherwise removed. Indeed, the records themselves appear to indicate they were not recently updated. Additionally, they are accompanied by a warning that they are potentially inaccurate and not to be relied upon.

8. When Plaintiff Peterson applied for a mortgage loan, the mortgage loan officer obtained a Credit Plus report that falsely showed unsatisfied civil judgments belonging to Plaintiff. In reality, Plaintiff had paid off the judgments many months before the report was pulled.

9. The problems with Credit Plus's routine reporting of inaccurate and outdated information related to public judgments are systematic and the uniform result of Defendant's blind and unjustifiable reliance on an unreliable vendor.

10. Plaintiff thus brings this case on behalf of himself and a class of those similarly situated to obtain damages for Credit Plus's willful violations of the FCRA.

## PARTIES

11. Plaintiff Christopher Peterson is a natural person who resides in St. Paul, Minnesota. He is a "consumer" as defined by 15 U.S.C. § 1681a(c).

12. Defendant Credit Plus, Inc. is a Maryland corporation headquartered in Salisbury, Maryland. It is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f). Credit Plus is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION & VENUE

13. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

15. Credit Plus sells consumer reports to mortgage lenders about consumers seeking mortgage loans. The reports sold by Credit Plus contain data Credit Plus obtains from other consumer reporting agencies, such as the "Big 3" credit bureaus (TransUnion, Experian, and Equifax) and LexisNexis. Credit Plus then assembles and merges that information and sells it to third parties under its own name.

16. In particular, Credit Plus sells a RiskView Liens and Judgments report which purports to indicate whether the consumer is associated with any tax liens or civil judgments and the payment status of those liens and judgments. LexisNexis, however, is

the source of the data in the RiskView Liens and Judgments. And LexisNexis has a long and well-known history of reporting inaccurate public record information.

17. For years, LexisNexis was the exclusive provider of tax lien and civil judgment information that was included on credit reports issued by the Big 3 credit bureaus.

18. The public record information provided to the Big 3 by LexisNexis was frequently inaccurate and out-of-date.

19. In 2015, the Big 3 entered into a multi-state settlement agreement with over 30 state attorneys general that attempted to alleviate some of the accuracy issues with respect to the reporting of tax liens and civil judgments.

20. In 2017, pursuant to that settlement, the Big 3 agreed to only report public records if they were updated every 90 days.

21. In 2018 and 2019, the Big 3 went a step further, and agreed to stop completely the reporting of public records and tax liens, as part of three nationwide class actions settlements. *Clark v. Trans Union, LLC*, No. 3:15-cv-00391 (E.D. Va.); *Clark v. Experian Info. Sols., Inc.*, No. 3:16-cv-00032 (E.D. Va.); *Thomas et al. v. Equifax Information Services, LLC*, No. 3:18-cv-00684-MHL (E.D. Va.).

22. LexisNexis, however, decided to take advantage of the Big 3's decision to stop selling LexisNexis's data by selling its public record data in its own consumer reports. LexisNexis issued a report targeted at lenders and creditors regarding the purported

5

"negative consequences" of not having tax lien and civil judgment information included in credit reports.[1]

23. Indeed, LexisNexis markets its "RiskView Liens and Judgment Report" as providing the information no longer provided by the Big 3: "After the removal of liens and judgments data from credit reporting agencies, companies found themselves in need of other data sources to support their models. Learn how LexisNexis® Risk Solutions offers a product that provides liens and judgments so that credit models don't have to be recalibrated or altered."[2]

24. In 2017, Credit Plus decided to take advantage of the Big 3 pulling back public records reporting as well, announcing that "it will be offering LexisNexis® RiskView™ Liens & Judgments Report."[3] The announcement noted that "Equifax, TransUnion and Experian reduced the amount of tax lien and civil judgment information they report on consumer credit files" as part of the multi-state settlement. *Id.* Credit Plus's representative stated, "[a]t Credit Plus, we are all about helping mortgage professionals make more informed lending decisions and this new tool is another way to accomplish that." *Id.* Credit Plus currently touts on its website that "[t]he LexisNexis® RiskView™ Liens & Judgments Report provides technology advancements that improve the accuracy

---

[1] https://solutions.risk.lexisnexis.com/Liens-Judgments-Impact-Report
[2] https://risk.lexisnexis.com/insights-resources/presentation/navigating-the-new-environment-for-liens-and-judgments
[3] https://creditplus.com/knowledge-hub/press-releases/credit-plus-inc-adds-lexisnexis-riskview-liens-judgments-report/

and timeliness of lien and civil judgment data. Our solution can help you maintain your competitive edge without adding the expense of recalibrating your models."[4]

25. Nowhere in the announcement or its website did Credit Plus (or LexisNexis) acknowledge that the reason the Big 3 ceased reporting liens and judgments was *because of* LexisNexis's faulty data.

26. LexisNexis uses automated procedures and, in some instances, collects information regarding judgments and tax liens that undergo little, if any, meaningful quality control. As a matter of common policy, LexisNexis does not adequately update tax lien or judgment disposition information when a civil judgment or tax lien is satisfied.

27. For example, in litigation against Experian, which obtained its records from LexisNexis, the data analyzed showed an average delay in obtaining and reporting civil judgment status updates at 77.0146 months. In South Carolina, lien updates took an average of 243.5 days between the time the disposition update was recorded in the public record and the date that Experian eventually obtained it. These findings were included in public filings to which Credit Plus had access.

28. LexisNexis fails to update records because some governments delete or expunge records upon satisfaction or no longer provide to LexisNexis the data regarding satisfied judgments or liens. LexisNexis does not make the minimal effort to ensure that it does not include in its reports records that are no longer being provided by the government.

---

[4] https://creditplus.com/mortgage-lender/services/riskview-liens-judgments-report/

29. Credit Plus, in turn, never checks the underlying status of any public record before including it on a consumer report. Credit Plus does nothing meaningful to ensure the accuracy of LexisNexis's reporting.

30. Instead, Credit Plus publishes public records data that it knows may be inaccurate if a release, satisfaction, dismissal, vacatur, or appeal had occurred. Rather than ensuring that these records are accurate, Credit Plus relies entirely on LexisNexis and puts the onus on consumers to clean up inaccuracies in their own files via the dispute process.

31. At all times pertinent to this Complaint, Credit Plus's conduct regarding the reporting of the dispositions of tax liens and civil judgments was willful and carried out in reckless disregard for consumers' rights as set forth under the FCRA. By example only, and without limitation, Credit Plus's conduct is willful because: the conduct was intentionally accomplished through intended procedures; Credit Plus had knowledge that LexisNexis was not a reliable source of public record information; and Credit Plus believed that collecting and reporting derogatory information was of greater economic value to its paying customers than "disposition" information demonstrating that debts were no longer owed.

32. As a result of Credit Plus's conduct, Plaintiff and the putative class members suffered particularized and concrete injuries, including damages to their reputations, credit, and increased risks that they would be denied credit.

### PLAINTIFF PETERSON'S EXPERIENCE

33. On or about May 1, 2014, there was a default judgment entered against Plaintiff Peterson in Hennepin County, Minnesota, Case No. 27-cv-146775.

8

34. This judgment was satisfied on December 11, 2018. The current online docket reflects the judgment as satisfied.

35. On or about April 22, 2016, there was a judgment entered against Plaintiff Peterson in Hennepin County, Minnesota, Case No. 27-cv-165626.

36. Plaintiff satisfied this judgment on September 13, 2019. The current online docket reflects the judgment as satisfied.

37. Hennepin County routinely updates online dockets in a timely manner to reflect satisfactions.

38. In February 2020, Plaintiff Peterson applied for a mortgage loan with LendSmart Mortgage. As part of the loan process, Credit Plus sold a credit report to the mortgage loan officer.

39. The Credit Plus Report contained a "RiskView™ Liens and Judgments Report Powered by LexisNexis."

40. Despite the fact that both of Plaintiff's above-mentioned judgments were satisfied, Credit Plus reported that they were both still unsatisfied with a Release/Satisfied Date of "N/A".

41. Had Credit Plus checked the online Hennepin County dockets before providing the report, it would have seen that the judgments had been satisfied.

42. The inaccurate report was due to Credit Plus's systematic failure to ensure that the public record information it reports is accurate and up-to-date. A simple online search would have revealed that the judgments have been satisfied.

43. As a result of this inaccurate information in Plaintiff's credit report, Plaintiff was denied the loan for which he had applied.

44. As a direct and proximate result of Credit Plus's conduct, Plaintiff Peterson suffered harm, including the loss of credit opportunities, the loss of time spent investigating Defendant's false and harmful information, embarrassment, and humiliation.

45. Credit Plus knew that its reports routinely contained inaccurate information from LexisNexis, but reported the information anyway.

46. In a transparent effort to avoid liability for its actions, Credit Plus acknowledged the problems with its reporting. Plaintiff Peterson's report, for example, contains the following language:

> *NOTE: The information in this report is provided to supplement the authorized recipients' other processes to identify potential misrepresentations. The data is gathered from multiple third-party sources and is based on the input data. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect and cannot be guaranteed. Before relying on any data, it should be independently verified. This report or data may not be resold.*

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings his claim for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class and Subclass (collectively "the Class"):

**NATIONWIDE CLASS**

All natural persons about whom Defendant reported an unpaid judgment or tax lien in the five years prior to the filing of this Complaint when in fact the judgment or lien had been satisfied, vacated, or expunged more than 30 days before the date of Defendant's report and Defendant did not report that the judgment or lien had been satisfied, vacated, or expunged, at any point in the

period beginning five years prior to the filing of this Complaint and continuing to the date of the entry of judgment in this matter.

**MINNESOTA SUBCLASS**

All natural persons about whom Defendant reported an unpaid judgment or tax lien from Minnesota in the five years prior to the filing of this Complaint when in fact the judgment or lien had been satisfied, vacated, or expunged more than 30 days before the date of Defendant's report and Defendant did not report that the judgment or lien had been satisfied, vacated, or expunged, at any point in the period beginning five years prior to the filing of this Complaint and continuing to the date of the entry of judgment in this matter.

48.   Plaintiff reserves the right to amend the definition of the Class and/or Subclass based on discovery or legal developments.

49.   **Numerosity. FED. R. CIV. P. 23(A)(1).**  The class members are so numerous that their joinder is impractical.  Defendant furnishes thousands of reports on consumers each year that include lien and judgment information, and those persons' names and addresses are identifiable through documents maintained by Defendant, through documents maintained by LexisNexis, and through public entities that maintain civil judgment and tax lien information.  Civil judgment and tax lien data can be compared to Defendant's reports to ascertain which consumers would meet the definition of the Class and Subclass above.

50.   **Existence and Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(A)(2).**  Common questions of law and fact exist as to all class members and predominate over the questions affecting only individual members.  The common legal and factual questions include, among others,

11

  a. whether Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the public record information it reported;

  b. Whether this conduct constituted violations of the FCRA; and

  c. Whether the violations were negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of Plaintiff and class members.

51. **Typicality. FED. R. CIV. P. 23(A)(3).** Plaintiff's claims are typical of the claims of the members of the Class and Subclass. Plaintiff has the same claims as class members, arising out of Defendant's common course of conduct and from the same operative facts, and are based on the same legal theories. Plaintiff, as every putative class member, alleges violations of the same FCRA provision, 15 U.S.C. § 1681e(b). These claims challenge the credit reporting procedures of Defendant and do not depend on any individualized facts. Defendant's notice and knowledge of the challenged reporting problem is the same for Plaintiff, as for the putative class members.

52. **Adequacy. FED. R. CIV. P. 23(A)(4).** Plaintiff is an adequate representative of the Class and Subclass. Plaintiff's interests are aligned with and are not antagonistic to, the interests of the class members. Plaintiff has retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously. Plaintiff and counsel will fairly and adequately protect the interests of the class members.

53. **Predominance and Superiority. FED. R. CIV. P. 23(B)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and

efficient adjudication of this controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the Class and Subclass individually to redress effectively the wrongs done to them. Even if the class members themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expenses to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## **CLAIM FOR RELIEF**

### COUNT I
### For Defendant's Violation of 15 U.S.C. § 1681e(b)
### On Behalf of Plaintiff, and the Class and Subclass

54. Plaintiff incorporates by reference the above paragraphs as though set forth in full herein.

55. The above-mentioned reports are "consumer reports" within the meaning of 15 U.S.C. § 1681a(d).

56. Defendant is regulated by the FCRA, which provides that, "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

57. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding Plaintiff Peterson and the class members, specifically by reporting outdated and inaccurate information on public records such as civil judgments and tax liens.

58. As a result of Defendant's misconduct, Plaintiff and class members suffered damages to their reputations, reductions to credit scores, and increased risk of credit denial.

59. At all times pertinent hereto, Defendant's conduct was a result of its deliberate policies and practices, was willful, was intentionally accomplished through intended procedures, and was carried out in reckless disregard of consumers' rights as set forth in section 1681e(b) of the FCRA.

60. Pursuant to 15 U.S.C. §§ 1681n and o, Defendant is liable to Plaintiff and the class members for its failure to comply with FCRA § 1681e(b), in an amount equal to the sum of (1) damages of not less than $100 and not more than $1,000 per violation; (2) actual damages; (3) punitive damages in an amount to be determined by the jury; (4) attorney's fees; and (5) litigation costs, as well as such further relief as may be permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the class members pray for relief as follows:

a. An order certifying the case as a class action on behalf of the proposed Class and Subclass under Federal Rule of Civil Procedure 23 and appointing Plaintiff and the undersigned counsel of record to represent same;

b.  An award of actual, statutory and punitive damages for Plaintiff and the class members;

c.  An award of pre-judgment and post-judgment interest as provided by law;

d.  An award of attorney's fees and costs; and

e.  Such other relief as the Court deems just and proper.

### I.  TRIAL BY JURY

Plaintiff hereby requests a trial by jury on those causes of action where a trial by jury is allowed by law.

Dated: June 22, 2021                    Respectfully submitted,

*/s/ E. Michelle Drake*

E. Michelle Drake, MN Bar No. 0387366*
John G. Albanese, MN Bar No. 0395882
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T: 612.594.5999
F: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Todd M. Murray, MN Bar No. 0347462
Friedman Murray
509 First Ave. NE, Suite 2
Minneapolis, MN 55413
todd@friedmanmurray.com
612-564-4024

*Attorneys for Plaintiff*